Good morning, Your Honor, and may it please the Court. My name is Ray Saley, and I represent Petitioner Mina Soliman. I'm keeping track of my own time, but I'd like to reserve about two minutes for rebuttal. Mr. Soliman was almost kidnapped by Salafi Muslim extremists who came to his home, physically grabbed him, pulled him to the ground, and nearly dragged him away. He had previously received menacing threats, including one from a caller who implied that he deserved to be amputated if he did not convert to Islam. All of this took place in Egypt, a predominantly Muslim country where government officials claim to condemn sectarian violence, but whose actions in fact show that they consistently fail to take meaningful steps to prevent that violence when it happens against Christians like Mr. Soliman. And at times, they even protect the perpetrators of that violence. These facts compel the conclusion that Mr. Soliman suffered past persecution, that he has an objectively reasonable fear of future persecution, and that he is therefore entitled to withholding of removal and is eligible for asylum. Unless the Court prefers otherwise, I'm going to go over Mr. Soliman's past persecution claim first, and then move on to his claim that he has an objectively reasonable fear of future persecution. Counsel, can I ask a question? Just as you get into that, and this might help you frame your argument, our case law indicates you have to have significant actual suffering or harm in order to have to show past persecution. What evidence is there that there was significant actual suffering or harm? I understand there was intimidation, even harassment, but what can you point to to show significant actual suffering or harm? Your Honor, I think that language, the significant actual suffering or harm, is taken from cases like Lim and perhaps the Duran Rodriguez case. And the reason that that standard doesn't actually apply here is because those cases involve situations where the asylum claimant based their past persecution claim on what the Lim case called threats alone. In other words, if you're going to apply for asylum and claim that the past persecution consisted entirely of threats, telephonic threats, mail threats, whatever, then you have to show that those threats themselves inflicted significant actual harm. They caused you in the same way that physical harm or physical persecution would result in harm. But that's not the situation we have here. The situation we have here is more akin to the cases cited throughout the brief, Ruano and Reyes-Guerrero. And what happened in those cases was that the persecution claims rested on threats, but those threats were corroborated by subsequent action taken by the people involved in the threats. In other words, because the threats were later shown to be meaningful and credible threats, there was no requirement that the court impose that those petitioners show that they suffered actual physical suffering or harm. So I think... Mr. Staley, does that mean, excuse me for interrupting you, does that mean that the incidents that the petitioner describes in his testimony at the merits hearing and so forth in the brief have to be connected in some fashion? So there's, he claims harassment from his employer. He leaves, I believe, in August 2017, approximately nine months later, in May 2018, there's the incident with three or four men coming through his door. And he, I have his testimony up on the screen. I was re-reviewing it. He doesn't say that they said anything to connect themselves to his past employer. He speculates he may have been trying to kidnap him. And he says he was fearful because they knew his name and what he was doing. So do those two, do those incidents need to be connected or the telephonic threats, do they all have to be connected in some fashion? I think the incidents that Mr. Solomon experienced, the evidence shows that they were connected because what happened was his employer discovered him using the office to prepare materials that promoted his Christian faith and promoted his church. Eventually, and his employer was the only one who knew about that activity. Suddenly, he started receiving threats saying, we've heard that you're promoting Christianity. You better stop doing that. You are doing what you're doing. Then after that, and yes, there is some time in between those threats and the confrontation at his home. But as Mr. Solomon testified in front of the immigration judge, who found his testimony credible, those men knew details that only his employer was aware of. So because I'm actually looking at the transcript, I know that he didn't say that. So I'm looking at 84 and 85. And in 84, he describes what they said. And he just says, they know all of my information. They know what I'm doing in my name. But wasn't he holding himself, he was conducting a business out of his home. So he was holding himself out to basically continue the sort of work he was doing for his previous employer. But he doesn't say anything about his past employer or anything that happened at his job. And then on page 85, he doesn't say anything that these men said anything to him about his past employment or connected them. So I mean, I think you want to draw that inference, but I don't think that's his testimony. So I'm struggling with a connection when nine First of all, I would note that later in the transcript, and I could try to track that down. There is a moment where there it suggested that there might be some sort of translation difficulty and what appears in the transcript. But so if English isn't Mr. Solomon's first language, and perhaps there is one interpretation of the exact words that made it on the text, Your Honor, is what you suggested. But he does state, you know, he's asked, why do you think they were trying to pull you out of the apartment? It doesn't really let that type of question doesn't really lend itself to an answer that talks about what he was doing in his private business, because it has nothing to do with religion. But he does testify, what he does say to the immigration judge, is that the men who confronted him were dressed in traditional Salafi Muslim dress. And he says things like phone calls that I was receiving in my relationship with previous managers, all of this adds up. So I think the only reasonable inference here, given the extremity of these this group's actions, when they confronted him at his home, is that they were motivated by the religious activities that had caused them to receive threats in the past. Certainly, there isn't any evidence that this was a business dispute, or something less than that. Well, we don't know that. We don't really know. Well, one thing I would point out, Your Honor, is that when Mr. Solomon was in competition with someone he worked for for many years, although there's nothing in the record to show a connection between that. It's as easy to infer that as it is to infer that, that the government was somehow involved in the persecution. Well, I don't think there's a claim that the government was involved in the persecution, Your Honor. I think Mr. Solomon's claim is that a group of private citizens who the government was unable or unwilling to control is responsible for the act of past persecution that my client... There's no evidence. There's no evidence to show anything relating to the government's willingness or unwillingness, capability or incapability. Well, Your Honor... We know that the cops have suffered for many, many years in Egypt. And we also know that it's official government policy to criticize that and to try to protect the cops. Whatever standard of effectiveness you might apply, I still think you don't have a connection with anything that the government instigated or tolerated. Well, Your Honor... Sorry, Your Honor. I'd provide two responses to that. First, we can look at the immigration judge's own words in their own decision. And this is an area where I think there's a significant contradiction. The IJ specifically holds that there is a reasonable possibility that harm could come to Solomon due to his religious affiliation. That's a finding, a conclusion that they actually put on paper. I'm sorry, say that again. The IJ, in its opinion, AR-41, specifically says and finds, it says this court finds there is a reasonable possibility that harm could come to Solomon due to his religious affiliation. And then it contradicts itself. The opinion contradicts itself by saying that this might not come from the hands of the government or groups the government is unable or unwilling to control. But recall that one of the ways the government or that a fear of future persecution can be demonstrated is that the government is unable to control a group that will cause harm to him. So if the court's already concluded that there's a reasonable possibility he'll be harmed, it simply doesn't make sense that the government would somehow be able to control the groups that would inflict that harm. There's an internal contradiction there. There's a reasonable possibility that he's afraid of being harmed. But as we've already pointed out, there's no evidence of harm. Well, the... It's credible, it's credible, the IJ found in worrying about the threat. Worrying that the threat will come true. And you make a very good point that psychological terror can be terror. But it falls down because of the inability to link anything that the government tolerated or instigated in terms of the threats made by these three people who dressed up in Salafi costumes and threatened him. Or were Salafis and threatened him. That's the rub. So, in my mind, there's some connection you need with the government. Well, the connection here, your honor, is the hundreds of pages of evidence that Mr. Solomon introduced showing that the Egyptian government systemically fails to prevent violence by Salafi Muslims against Christians, and then takes steps to insulate those proceedings, rather than initiating actual legal proceedings. So, Mr. Saleh, are you suggesting that when a government takes steps to combat some potential harm to its citizens, its residents, if they're not entirely successful? I mean, we see this all the time in the drug cartel cases from Central and South America. The country may be able to combat what's going on, but they're not entirely successful. Does that mean they're unwilling or unable? I mean, you're suggesting that because the government of Egypt cannot completely stamp out or guarantee the safety of all of its citizens, whatever their religious affiliation, that that means they're unwilling or unable. I don't think that's our case law. Is that what you're suggesting? Well, your honor, I do see my time is up. So if I may just provide a response to your last question. Of course. We're certainly not suggesting that that's what the case law says. But what we have here is a plethora of evidence. There's simply no evidence that the Egyptian government takes preventive measures to prevent violence against Christians. What we see in the evidence, what the government cites and what the agency cites, are statements that the country lights diversity, statements that the country opposes sectarian violence, and then symbolic measures like rebuilding churches, or declaring days of mourning after violence takes place. But there isn't any evidence in the record that the Egyptian government affirmatively takes steps to prevent the violence from occurring in the same place. To the contrary, the evidence shows the opposite. It shows that in the situations where crimes or crimes, everything's happened, they often try to pressure the victims into dropping their legal claims to ensure that the perpetrators of the violence aren't forced to face legal consequences for their actions. Unless the panel has further questions. Yeah, counsel, we'll, we'll, we'll try and give you a little bit of time for rebuttal. Mr. Schallzer. Good morning, Your Honors. Counsel, and may it please the court. My name is Rom Schallzer. I'm here on behalf of the AG. Your Honors, like my brother counsel, I just I'll start with path persecution and move on through there. As you know, persecution is an extreme concept. And when we're talking about, we're talking about actual violence, harm, either physical or mental, suffered by the applicant. And in this case, is the government, I take it the government's position is that as to past persecution, there was no showing of significant actual suffering or harm. And that was the standard that needed to be shown. Correct, Your Honor, either through the threats or through the interaction. Yes, Your Honor, I view this largely as a threats case, because we don't see physical harm, right? One of the things that we would ordinarily look to in an application is to say, okay, were you injured? But here he points to no actual physical injury, he doesn't point to a mental health, he didn't have to seek therapy, or other mental health treatment. Those are usually things we look for when we try to assess the severity of harm, when we talk about persecution. So instead, we can look at the threats. But here, this wasn't like a, even a normal death threat case, which normal death threat, we see threats of death that are so significant, that it causes actual physical harm, actual mental harm to the recipient, to the victim. And here we just don't see that sort of thing. Okay, but let's assume that's correct. And that takes care of the past persecution. He can still show, even absent physical harm, significant physical harm, he can still show that there's a serious threat of future persecution, correct? He could. Except in this case, he didn't because he didn't provide enough evidence from which we could be unable or unwilling to protect him. And that's tucked into the definition of persecution itself, right? He has to show that either for past persecution, or first, or future persecution, but the source of the harm has to either be the government itself, or third parties, the government's unable or unwilling to control. And here, first, first of all, with respect to him specifically, he provided no evidence for the government would be unable or unwilling to help him, because he intentionally declined to seek protection from the police. He said he couldn't trust the police. He didn't know whether they would be Salafi sympathizers or not. So he chose not to report any of the stuff to him. So is that the rule, then, that if the petitioner doesn't report the threat, or the violence, they can't then take protection from the provision of future persecution? I believe the case law says that reports are not required, where, for example, reporting the harm may actually cause further harm. Like, we're not like that. But what we can look to and say, well, in this case, where you haven't sought medical treatment, you haven't, you haven't suggested injury or severe threats, or just these vague threats, would the police be able to help him or not? We don't know. And again, that was one of his things. One of the elements that he had to establish was whether the police would be unable or unwilling to help him. So with respect to him in particular, But does that, does that question ultimately turn on the fact that his testimony is that he didn't report it because he didn't think that they would help him? I mean, and that is different than, I didn't report it because I thought that they would actually aid in the persecution. Is that, is that the government? Yes, Your Honor. And the reason for that is because in one case, it's purely conjectural. He said he didn't know whether the police would help him or not. And so he didn't report it. And that's different than the case where, for example, Judge Boddy brought up drug cartels before, you know, in cases from Central America where the applicants may think that the police are working with the cartels. Well, obviously, if they say, hey, no, I didn't report it to police because my friend said that the police are working with the cartels. That's a different story than what Petitioner told, which like much of his claim was speculative. He only speculated about the motives of the four men who came to his house. He only speculated that the police wouldn't help him if he went to the police. And additionally, on that count, we can also look to the authorities statements at large. We know that official policy of the country of Egypt is to protect the cops. The official policy is to remedy violence against them and also against their holy sites. We know that they have prosecuted attackers of the cops. That's all part of the record evidence. And none of that tended to suggest that the And that's why on the other side, when we're talking about well-founded fear, he simply did not bring the evidence necessary to compel the conclusion that he was he was eligible for relief. And I might add, as I wrote in my brief, I do believe he's waived that issue by failing to brief it. But wait a minute. So I I saw that and I thought that was interesting. You're suggesting waiver in your brief, I guess, because he doesn't use the phrase unwilling or unable. But he says a lot of other things in the brief. It's just he's raising that argument. He talks about their government's failure to take meaningful steps to prevent sectarian violence. They're dismissive or outright hostile treatment of Coptic Christians, Coptic Christian crime victims. And he also argues that Egyptian officials often turn a blind eye to such violence. They fail to prevent violent acts. So it seems that he's he's making the acquiescence argument. The unwilling or unable argument just doesn't use the phrase. And so to me, it seems that that would be a pretty harsh interpretation of his argument to say that he didn't actually didn't actually argue acquiescence. Your Honor, I tended to read his brief as leaning very heavily into the disfavored group analysis. And all of the things you just suggested were wrapped up in that analysis. But there are two steps here. First, first to demonstrate simply persecution. And part of the definition of persecution is that unable or unwilling to control. And we're talking about third party violence. And so that's why I tended to focus on that one. Also, because the board specifically named it. Right. I look to see, you know, I can only defend these cases based on the reasoning of the board. So when I'm reading a board decision, that's the first thing I'm looking at is, OK, what did the board actually say here? They're specifically relying on whether or not petitioner demonstrated the inability or unwillingness of the Egyptian government to protect him. And he didn't. So that's that's why I live with that, Your Honor. And speaking of disfavored group analysis, the one last thing I would add is if for some reason this court decided that the evidence did compel the conclusion that the government was unable or unwilling to protect him, then it would be up to the board in the first instance, and really the immigration judge, to do that disfavored group analysis in the first instance, to weigh that evidence of the petitioner talks about here that didn't get weighed before. And the board specifically said in its decision it wasn't going to reach any other elements than the two elements discussed. If you have no other questions, Your Honors, I urge you to affirm the board in this decision. Thank you. Thank you, Counsel. Mr. Seeley, we'll give you one minute for rebuttal. You're on mute. Sorry about that, Your Honor. Thank you, Your Honor. I'll quickly address two points raised by the government in its argument. First, the government talks about the fact that Mr. Solomon didn't initially seek protection from the police. And I think as Your Honor indicated, as Judge Nelson indicated, there was evidence in this case that going to the authorities would only result in additional persecution. I didn't know. I thought that that was the difference. That if there were evidence that going to the authorities would result in additional persecution, that might be enough. But here, his response was, well, I just didn't think I'd get any help, so I didn't go. But that's not the only evidence he presented, Your Honor. He presented a plethora of articles and reports indicating that the Egyptian government regularly engaged in things like blasphemy prosecutions and would often punish Christians who reported Muslims for engaging in these threats by saying that they were inciting violence. And there are several articles cited throughout the petitioner's brief that demonstrate that this is the Egyptian government's pattern and practice. And remember, this is coupled with the fact that Mr. Solomon's employer told him, if you keep doing this, or if you go to the authorities, I'm going to tell them you tried to convert me from Islam. And there are articles in the record that show that that has been treated as a crime in Egypt. So Mr. Solomon had plenty of reason not to go to the authorities. I also wanted to quickly touch on this idea of waiver and what the government's attorney just said about disfavored group analysis. Ninth Circuit case law treats disfavored group analysis as part of the unwilling or unable analysis in the reasonable fear of persecution prong of the asylum question. And in this case, that's essentially what the IJ and the BIA did. They basically said, there's not enough evidence here that Coptic Christians are so systematically disfavored by the Egyptian government that Mr. Solomon wouldn't be able to seek recourse or protection from the government. And the sources that we produced in the record that the IJ ignored and replaced with a judicially noticed document that it recognized an error, essentially support that point and demonstrate that Mr. Solomon faces a And as a result, Your Honor, we request that the court grant Mr. Solomon's petition. Thank you. Thank you, counsel. Thank you both counsel for your help on this case. The case is now submitted and we will move on to our second and final argument of the day. Gentlemen, can I have two minutes of personal break? A break, yeah. Court's in recess for two minutes.
judges: Hellerstein, Nelson, Bade